IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

REVERSE MORTGAGE SOLUTIONS,
INC.,

                      Plaintiff,

       v.

UNITED STATES OF AMERICA -
DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT, *et al.*,

                  Defendants.

PATRICIA WILSON,

      Crossclaim Plaintiff,

       v.

UNITED STATES OF AMERICA -
DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT,

      Crossclaim Defendant.

Case No. 18 C 2149

Judge Harry D. Leinenweber

MEMORANDUM OPINION AND ORDER

Before the Court is Defendant United States Department of Housing and Urban Development's Motion to Dismiss Crossclaims by Plaintiff Patricia Wilson. For the reasons stated herein, the Motion (Dkt. No. 15) is granted in part and denied in part.

I.  BACKGROUND

This case concerns a home equity conversion mortgage, also known as an "HECM" or "reverse mortgage," and an insurance program

run by the United States Department of Housing and Urban Development ("HUD"). Plaintiff Patricia Wilson's ("Ms. Wilson") husband Walter Wilson Jr. ("Mr. Wilson") took out a reverse mortgage that was insured by HUD on their home. Now Mr. Wilson has passed away and, as a result, Ms. Wilson is facing foreclosure. The foreclosure led Ms. Wilson to bring suit against HUD under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 551, *et seq.,* asserting that HUD's implementation of its insurance program caused the foreclosure action. For convenience of the reader, the Court will provide a brief overview of reverse mortgages and HUD's insurance program before turning to the specific facts of this case.

### A. Reverse Mortgages and the HUD Regulation at Issue

Reverse mortgages are a form of equity release in which a mortgage lender makes payments to a borrower based on the borrower's accumulated equity in his or her home. The lender provides the borrower with a lump sum or periodic payments, and the borrower need not repay the outstanding loan balance until certain "trigger" events occur (such as the death of the borrower or the sale of the home). Because borrowers can typically defer repayment until death, reverse mortgages function as a way for elderly homeowners to receive funds based on their home equity.

Reverse mortgages are "non-recourse" loans, meaning that if a borrower fails to repay the loan when due and the sale of the home is insufficient to cover the balance, the lender has no recourse to any of the borrower's other assets. The only routes to repayment are voluntary payment of the loan in exchange for release of the mortgage, voluntary conveyance of the residence, or foreclosure. If the proceeds resulting from a foreclosure are insufficient to cover the loan balance, the lender cannot seek a deficiency judgment against the borrower or their estate. This feature is favorable to borrowers but carries significant risk for lenders. If the borrower elects to receive regular disbursements rather than a lump sum, the disbursements can continue until the borrower's death. If the borrower lives longer than expected, and the disbursements exceed the value of the home equity, lenders can face a significant financial loss.

Congress, concerned that this risk to lenders was deterring them from issuing reverse mortgages, amended Title II of the National Housing Act to authorize HUD to administer an insurance program for reverse mortgages. 12 U.S.C. § 1715z-20 ("authorizing statute"). HUD, through its component agency the Federal Housing Administration ("FHA"), is authorized to provide insurance to private lenders who offer qualifying reverse mortgages to elderly homeowners. Borrowers must be at least 62 years of age to qualify.

*See* 12 U.S.C. § 1715z-20(b)(1). To prevent a lender from incurring uninsured losses after reaching the maximum loan amount, the lender can elect to assign the reverse mortgage to the FHA when the reverse mortgage reaches 98% of the maximum loan amount. *See* 24 C.F.R. § 206.107(a). If the lender makes that election, HUD takes on responsibility for servicing the loan until a trigger event occurs; when such an event occurs HUD may foreclose the home if necessary. The insurance program also compensates lenders for some or all their loss when the proceeds from the sale of a house are less than the outstanding loan balance. In exchange, lenders must comply with HUD regulations and pay a monthly mortgage insurance premium ("MIP"). *See* 24 C.F.R. § 206.27(b)(7). Lenders generally pass the MIP costs directly on to the borrowers.

But Congress wanted to do more than just incentivize lenders. It also created the reverse mortgage insurance program to "meet the special needs of elderly homeowners by reducing the effect of the economic hardship caused by the increasing costs of meeting health, housing and subsistence needs at a time of reduced income." 12 U.S.C. § 1715z-20(a). The section of the authorizing statute at the heart of this case, titled "Safeguard to prevent displacement of homeowner," states:

> The Secretary may not insure a home equity conversion mortgage under this section unless such mortgage provides that the homeowner's obligation to satisfy the loan obligation is

deferred until the homeowner's death, the sale of the home, or the occurrence of other events specified in regulations of the Secretary. *For purposes of this subsection, the term 'homeowner' includes the spouse of a homeowner.*

12 U.S.C. § 1715z-20(j) (emphasis added).

HUD promulgated regulations to implement the Act. Until September 2017, one of those regulations required insured reverse mortgages to state that the mortgage balance "will be due and payable in full if a *mortgagor* dies and the property is not the principal residence of at least one surviving *mortgagor . . ."* 24 C.F.R. § 206.27(c)(1) (1996) (since amended) (emphasis added). And HUD regulation 24 CFR § 206.3 (until September of 2017) defined "mortgagor" as "each original borrower under a mortgage. The term does not include successors or assigns of a borrower." By substituting "mortgagor" for "homeowner," HUD's regulations required lenders to issue reverse mortgages that required foreclosure when the borrowing spouse dies, despite the authorizing statute's clear mandate that HUD not insure reverse mortgages unless they deferred foreclosure until both spouses died. One such reverse mortgage is at issue in this case.

Legal challenges to 24 C.F.R. § 206.27(c) led HUD to take action in an attempt to change the effect of its regulations on surviving spouses. HUD first fashioned prospective relief in a "Mortgagee Letter" directed to participating private lenders,

requiring all reverse mortgages issued after August 4, 2014, to include a Deferral Period. ML 2014-07 (April 24, 2014). The Deferral Period postpones a reverse mortgage's due and payable status (and subsequent foreclosure) until the death of the last eligible non-borrowing spouse. HUD later amended its regulations to codify this forward-looking relief. *See* 24 C.F.R. §§ 206.27(c), 206.55 (effective September 19, 2017). Thus, HUD implemented the anti-displacement intent of the authorizing statute for all reverse mortgages prospectively. However, reverse mortgages issued before August 4, 2014, still lacked protection for surviving spouses. In an attempt to address this gap, HUD issued additional requirements in Mortgagee Letter 2015-15. ML 2015-15 (June 12, 2015). ML 2015-15 created the Mortgagee Optional Election ("MOE") that is still in effect (prior versions of the MOE will be discussed below). The MOE allows a reverse-mortgage lender, at its election, to assign the reverse mortgage to FHA when the last surviving borrower dies, and the lender has met certain criteria. Once the reverse mortgage is assigned to HUD, the surviving spouse would be protected from displacement as long as they continue to maintain eligibility (*e.g.,* they must continue to reside in the property secured by the reverse mortgage). The MOE applies to all HUD-insured reverse mortgages that were issued prior to August 4, 2014. However, there are several restrictions on eligibility for

the ML 2015-15 MOE, one of which is at issue in this case: lenders must elect to assign the reverse mortgage within 120 days of the borrower's death. If that deadline is not met, lenders are required to foreclose on the subject property. *See* ML 2015-15 at 4.

## B. *Bennett*, *Plunkett*, and Progeny

Before turning to the facts of this case, the Court will briefly note other U.S. district court cases that have dealt with the consequences of HUD's reverse mortgage regulations on surviving spouses. The first legal challenge took place in the U.S. District Court for the District of Columbia. *See Bennett v. Donovan*, 797 F. Supp. 2d 69 (D.D.C. 2011) ("*Bennett I*"), *rev'd* 703 F.3d 582 (D.C. Cir. 2013). In *Bennett I*, surviving spouses brought suit against HUD under the APA, claiming the original 24 CFR § 206.27(c)(1) violated the APA because it was inconsistent with the authorizing statute. The court dismissed the case for lack of standing, finding that the complaint lacked redressability because it hinged on the independent choices of a third party regulated by HUD—the reverse mortgage lender. *Id*. at 75. The D.C. Circuit reversed *Bennett I,* finding that plaintiffs did have a redressable injury to the extent that their requested relief depended on the actions of HUD. *Bennett v. Donovan*, 703 F.3d 582, 590 (D.C. Cir. 2013). The circuit court found that HUD had the capacity to provide relief to the plaintiffs under 12 U.S.C. § 1715z-20(i),

eliminating the uncertainty of third party lender action. On remand, the district court granted summary judgment to the plaintiffs, finding that the HUD regulation was invalid as applied to plaintiffs because it violated the authorizing statute. *Bennett v. Donovan*, 4 F. Supp. 3d 5, 12-15 (D.D.C. 2013) ("*Bennett II*"). The court remanded the case to HUD to fashion relief.

While *Bennett II* was on remand to HUD, litigants filed *Plunkett v. Castro*, 67 F. Supp. 3d 1 (D.D.C. 2014). The *Plunkett* plaintiffs were surviving non-borrowing spouses facing foreclosure, alleging identical violations of the authorizing statute as the *Bennett* plaintiffs, as well as a claim that HUD's failure to act as a result of *Bennett II* violated the APA. The court consolidated *Bennett* and *Plunkett*. In summary judgment briefing, HUD argued to the court that plaintiffs did not have standing because the "automatic result" of the *Bennett II* ruling was that the death of the borrowing spouse was not a "triggering" event that requires foreclosure under § 206.27(c)(1). HUD termed this effect the "Trigger Inapplicability Decision" ("TID"). HUD reasoned that because of the TID, foreclosure on the reverse mortgage was not required for the six *Bennett-Plunkett* named plaintiffs. *Plunkett*, 67 F. Supp. 3d at 10. The court, however, held that the plaintiffs still had standing despite HUD's TID stance, because the TID did not provide them with all relief

allegedly within HUD's power. *Plunkett*, 67 F. Supp. 3d at 11-12
("Merely providing some redress does not negate plaintiffs'
standing."). The court also found that the TID did not render
plaintiffs' claims moot because it was not a "final agency action"
under the APA. *Id.* at 12. Finally, the court held that HUD's
failure to apply the TID remedy to all similarly situated, eligible
surviving non-borrowing spouses, instead of just the six named
*Bennett-Plunket* plaintiffs, was arbitrary and capricious. The
court again remanded the case to HUD to consider whether the TID
remedy applied to surviving non-borrowing spouses other than the
named plaintiffs. *Id.* at 23.

Courts have reached a variety of outcomes in subsequent cases
brought by surviving non-borrowing spouses. In *Harris v. Castro*,
No. 1:14-cv-3110, 2015 WL 13547618 (N.D. Ga. Nov. 19, 2015), the
court agreed with *Bennett* and *Plunkett* that 24 CFR § 206.27(c)(1)
was invalid as contrary to the authorizing statute. The *Harris*
court rejected HUD's attempt to dismiss the case as moot and
entered judgment in favor of the plaintiff, holding that the
plaintiff's husband's death "was not a triggering event for
purposes of HUD's reverse mortgage regulations and the [subject]
loan documents incorporating language from those regulations." *Id*.
at *8. In *Bombet v. Donovan*, No. 13-118, 2015 WL 1276569, at * 4
(M.D. La. Mar. 19, 2015), the court declined to hold the HUD

regulation invalid. The *Bombet* court found that a prior version of the MOE, which HUD initiated in Mortgagee Letter 2015-03 (ML 2015-03 (Jan. 29, 2015)), placed surviving non-borrowing spouses with pre-August 4, 2014, loans in a substantially similar position as those with loans issued thereafter. The ML 2015-03 MOE had substantial differences from the current ML 2015-15 MOE; for example, its deadline to make the election ran from the date of the loan servicer receiving notice of the borrower's death, rather than the date of the borrower's death. In *Federal National Mortgage Association v. Takas*, No. 2:17-CV-204, 2017 WL 3016785 at *3 (D. Utah July 14, 2017), the court heard the case of a surviving non-borrowing spouse who was eligible for the ML 2015-15 MOE, but whose lender did not elect to assign the loan to HUD. The *Takas* court found there was no further action HUD could take to force such an assignment. Similarly, in *In re: Larman*, No. 16-71624, 2017 WL 3575860 at *10 (Bankr. W.D. Va. August 17, 2017), the court held that it was unable to order HUD to provide any relief when the lender did not pursue the MOE assignment. The plaintiff in *Larman* did not claim that the policy provisions of ML 2015-15 were the cause of the denial. Neither *Takas* nor *Larman* involved a challenge to ML 2015-15 or its 120-day deadline. While the aforementioned opinions are instructive in analyzing the claims at hand, none are controlling precedent on this Court.

## C.  The Instant Lawsuit

This case arises from a foreclosure action that Reverse Mortgage Solutions ("RMS"), the lender of Mr. Wilson's reverse mortgage, brought against Ms. Wilson. HUD, as the insurer of the reverse mortgage, is a codefendant to the foreclosure action. Mr. Wilson's other heirs are also named as codefendants. The following facts derive from Ms. Wilson's Amended Answer and are, for purposes of this motion under both Federal Rule of Civil Procedure 12(b)(6) and 12(b)(1), accepted as true, with all inferences drawn in Ms. Wilson's favor. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (citing *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). (*See generally* Am. Answer, Ex. B to Not. of Removal, Dkt. No. 1.)

In 1993, Ms. Wilson purchased a home with Mr. Wilson, and has lived in that home ever since. In 2009, Mr. Wilson took out a HUD-insured reverse mortgage on the home from lender Urban Financial Group, who promptly assigned the loan to RMS. Ms. Wilson was under 62 years old at the time and could not be a signatory to the reverse mortgage, but she did sign the document as "a non-borrowing spouse." (Wilson Mortgage at 8, Ex. A to Ex. A to Not. of Removal, Dkt. No. 1.) The reverse mortgage contains the provision required by HUD regulation 24 C.F.R. § 206.27(c)(1), which states that the loan is due and payable in full upon the borrower's (Mr. Wilson's) death. (*Id.* at ¶ 9(a)(1).) Mr. Wilson died intestate on

November 22, 2015. Under the intestacy laws of Illinois, Ms. Wilson inherited a one-half interest in the property and Mr. Wilson's six surviving children and one granddaughter inherited the remaining one-half interest. All seven of Mr. Wilson's other heirs are willing to quit claim their interest to Ms. Wilson. (Am. Answer ¶¶ 17-18.) Mr. Wilson's death constituted a triggering event pursuant to § 206.27(c)(1) and began the 120-day clock for RMS to elect to assign the loan to FHA.

Ms. Wilson did not know that she was required to inform RMS of Mr. Wilson's death. In July of 2016, RMS sent Ms. Wilson a letter, which sought confirmation that Mr. Wilson continued to reside in their home. The same day, Ms. Wilson called RMS to inform it that Mr. Wilson had died. RMS asked Ms. Wilson to send in documents that could qualify her for a program to remain in her home, which she did. (Am. Answer ¶¶ 8-12.) Meanwhile, on September 23, 2016, RMS filed the underlying foreclosure action against Ms. Wilson and HUD in the Circuit Court of Cook County. (Second Am. Compl., Ex. A to Not. of Removal, Dkt. No. 1.) On October 19, 2016, RMS informed Ms. Wilson that it could not allow her to remain in the home because she had not informed RMS of Mr. Wilson's death within 120 days thereof. Ms. Wilson continues to live in the home and is current on all housing expenses, including taxes, insurance, and utilities; she is eligible for assignment

under the 2015-15 MOE in every way except for meeting the 120-day deadline. (Am. Answer ¶¶ 14-19.)

In her Amended Answer to RMS's Complaint, Ms. Wilson brought crossclaims against HUD under Rule 13(g), alleging violations of the Administrative Procedures Act. (Am. Answer ¶¶ 62-82). Her crossclaims consist of APA challenges to (1) HUD regulations 24 C.F.R. § 206.27(c)(1) and § 206.3, which operated together to require Mr. Wilson's loan to become due and payable upon his death ("the regulation challenges"); and (2) the 120-day deadline in ML 2015-15 ("the deadline challenges"). Ms. Wilson brings her challenges under 5 U.S.C. § 706(2)(A), claiming that both the regulations and deadline are arbitrary, capricious, or otherwise not in accordance with the law; and 5 U.S.C. § 706(2)(C), claiming that both the regulations and deadline exceed HUD's statutory authority. The case was removed to the Northern District of Illinois under 28 U.S.C. §§ 1442(a), 1444.

HUD now moves to dismiss all Crossclaims filed against it by Ms. Wilson. HUD argues that Ms. Wilson lacks subject matter jurisdiction under Rule 12(b)(1) for three reasons: (1) she lacks standing for all her claims; (2) her regulation challenges are moot; and (3) her regulation challenges are not judicially reviewable under the APA. Moreover, even if Ms. Wilson does have subject matter jurisdiction, HUD contends that under Rule 12(b)(6)

she has failed to state a claim upon which relief can be granted. The Court will consider subject matter jurisdiction and Ms. Wilson's ability to state a claim separately.

## II.  DISCUSSION

### A.  Dismissal under Rule 12(b)(1)

The existence of subject matter jurisdiction is a threshold issue and accordingly must be addressed prior to the merits of the underlying claims. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). In evaluating a challenge to subject matter jurisdiction, the Court must first determine whether a factual or facial challenge has been raised. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (citation omitted). Here, HUD's Rule 12(b)(1) motion is properly understood as a facial challenge. First, HUD contends that Ms. Wilson's Complaint lacks sufficient factual allegations to establish standing. Second, the material facts are not in dispute. (Def.'s Mot. to Dismiss ("Def.'s Mot.") at 10-11, Dkt. No. 21.) The Seventh Circuit has adopted the *Twombly-Iqbal* "plausibility" pleading standard, used for evaluating Rule 12(b)(6) motions, for use in evaluating facial challenges to subject matter jurisdiction under Rule 12(b)(1). *Silha*, 807 F.3d at 174 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). Under the "plausibility" standard, a complaint must "contain sufficient

factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 173-74 (citing *Iqbal*, 556 U.S. at 678). In reviewing HUD's facial challenge to subject matter jurisdiction, the Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *Id.* at 173.

### 1. *Standing*

To establish Article III standing, Ms. Wilson must allege facts sufficient to satisfy three criteria: (1) she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) her injury is fairly traceable to the challenged action of the defendant; and (3) it is "likely, as opposed to merely speculative," that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). As the party invoking federal jurisdiction, Ms. Wilson bears the burden of establishing the elements of Article III standing. *Id. at 561.* Ms. *Wilson also bears the burden of demonstrating* standing separately for each form of relief

sought. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC),*
*Inc.,* 528 U.S. 167, 185 (2000).

Here, Ms. Wilson suffered an injury in fact: risk of
displacement in the pending foreclosure action. Both parties
concede this point, and the Court finds no reason to disagree.

The parties do dispute, however, whether causation exists. To
establish causation, Ms. Wilson must show a causal connection
between her injury and the challenged agency action. *Lujan,* 504
U.S. at 560. When, as here, an injury arises from the government's
allegedly unlawful regulation, "causation and redressability
ordinarily hinge on the response of the regulated . . . third party
to the government action or inaction." *Id.* at 562. Third party
involvement in the injury can make standing "substantially more
difficult" to establish. *Id.* (quoting *Allen v. Wright*, *468 U.S.*
*737, 758 (1984)).* Accordingly, HUD argues that RMS's actions and
the terms of the subject reverse mortgage, not HUD regulations,
caused Ms. Wilson's injury. As such, HUD contends that Ms. Wilson
lacks standing for both her regulation challenges and deadline
challenges. The Court will address each type of challenge
separately.

First, *HUD argues Ms. Wilson cannot demonstrate causation for*
*the regulation challenges because* "the terms of the mortgage
contract—*not the regulations*—control when the mortgage becomes

due." (Def.'s Mot. at 14.) The Court is not persuaded. It is true that an independent action of a third party not before the Court is insufficient to establish causation. *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (citation omitted). However, causation can be established when an injury is produced by a "determinative or coercive effect upon the action of someone else." *Id*. That is the case here. HUD's regulations set the terms of the subject reverse mortgage, and HUD's regulations required RMS to foreclose upon Ms. Wilson. 24 C.F.R. § 206.125 ("The mortgagee shall commence foreclosure of the mortgage within six months of the due date defined in § 206.129(d)(1)."); ML 2015-15. If the lender fails to foreclose in time, HUD imposes a financial penalty: withholding any further interest the lender could have earned on the loan. 24 C.F.R. § 206.129(d)(2)(x). HUD's regulatory scheme is sufficiently "determinative" upon RMS to meet the causation standard. Thus Ms. Wilson has adequately alleged causation for her regulation challenges.

Next, HUD argues that Ms. Wilson has not demonstrated causation for the deadline challenges because RMS's actions, not the 120-day MOE deadline, caused her injury. In support of this argument, HUD points to the fact that other HUD regulations require insured reverse mortgage lenders to notify HUD within 60 days of the death of the last surviving borrower. 24 CFR § 206.125(a);

ML 2015-15. Therefore, HUD claims RMS should have been aware that Mr. Wilson had passed away and "should have had plenty of time to make an MOE." (Def.'s Mot. at 15.) Whether the 120-day MOE deadline is reasonable in light of the 60-day notification deadline goes to the merits of Ms. Wilson's challenge, which is better left for summary judgment. For now, it suffices to say that one HUD regulation will not defeat causation for an injury allegedly caused by another HUD regulation. Ms. Wilson alleges RMS was unable to utilize the MOE assignment only because of the 120-day deadline; this is sufficient to allege her injury was "fairly traceable" to the deadline.  The Court thus finds that Ms. Wilson has sufficiently alleged causation for her deadline challenges. Accordingly, both the regulation and deadline challenges pass muster as to causation.

The Court next turns to redressability. To satisfy redressability, Ms. Wilson must demonstrate that a favorable decision from the Court is likely to redress her injury. HUD's redressability arguments are concerned with what relief exactly the Court is able to order in this case. Therefore, by way of background, the Court will note that "redressability" can be limited in the context of an APA claim. Ms. Wilson asks this Court to "hold unlawful and set aside" agency actions under § 706(2) of the APA. If the Court agrees with Ms. Wilson that HUD's regulations

and/or 120-day MOE deadline are arbitrary and capricious, or otherwise not in accordance with law, the Court would not dictate to HUD what the precise remedy would be. Rather, it would remand to HUD for proceedings consistent with its legal determination. It is generally the prerogative of the agency to decide in the first instance how best to provide relief. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("If the record before the agency does not support the agency action, . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."); *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012) ("When a district court reverses agency action and determines that the agency acted unlawfully, ordinarily the appropriate course is simply to identify a legal error and then remand to the agency, because the role of the district court in such situations is to act as an appellate tribunal."). Thus, the Court recognizes that even if the Court issues a decision favorable to Ms. Wilson, and remands to HUD, she has no *guaranty* of relief because HUD may decide that no relief is appropriate. *See Bennett v. Donovan*, 703 F.3d 582, 589 (D.C. Cir. 2013).

HUD claims that Ms. Wilson's injury is not redressable because it is "not likely that a favorable decision regarding HUD's regulations will affect the private lender's foreclosure efforts,"

as such a ruling arguably could not void the reverse mortgage or insurance contracts. (Def.'s Mot. at 16.) HUD is correct that the subject reverse mortgage is already fully formed, and the Court cannot alter its terms. If RMS were the only party with the discretion to avoid foreclosure, Ms. Wilson's challenges would face the problem of "merely speculative relief." *Lujan*, 504 U.S. at 561. However, that is not the case here. HUD has the authority to issue mortgagee letters that create alternative methods lenders can utilize to obtain claim payment of FHA insurance. HUD also has the authority under 12 U.S.C. § 1715z-20(i) to accept assignment of reverse mortgages at a lender's election. Here the Court agrees with the D.C. Circuit Court, the only appeals court to have analyzed redressability in this context. *See Bennett*, 703 F.3d at 584. That court held that, assuming the regulation is unlawful, "HUD itself has the capability to provide complete relief to the lenders and mortgagors alike, which eliminates the uncertainty of third-party action that would otherwise block standing." *Id*. As the *Bennett* court concluded, HUD is the government actor alleged to have caused the injury, and HUD is the actor that can provide relief—"that arrangement is sufficient to establish that relief is likely." *Id*. at 590. Because relief for Ms. Wilson's injury does not depend solely on RMS's independent decision to foreclose, redressability is possible.

There are several potential "favorable decisions" from the Court that would likely redress Ms. Wilson's injury. If the Court found the 120-day MOE deadline to be arbitrary and capricious or otherwise not in accordance with law, the Court could hold the deadline unlawful, set it aside, and remand to HUD. The Court could do the same for the challenged HUD regulations. On remand, HUD could waive the 120-day MOE deadline, as HUD has authority to waive any provision of its regulations for good cause. 24 C.F.R. § 5.110, 42 U.S.C. § 3535(q). HUD could also decide on remand to accept the reverse mortgage for assignment under 12 U.S.C. § 1715z-20(i). *See Bennett,* 703 F.3d at 588-89 (noting HUD has statutory authority to: (1) accept assignment of an insured reverse mortgage if the lender elects to assign; (2) pay off the balance of the loans to the lender; and then (3) decline to foreclose against a surviving spouse). *See also Plunkett*, 67 F. Supp. 3d 1, 17 (noting that the MOE is evidence that "HUD expressly recognizes" it can accept assignment of reverse mortgages at the election of the lender). The Court could enter a declaratory judgment stating that 24 C.F.R. § 206.27(c)(1) is invalid as applied to the subject reverse mortgage, and that Mr. Wilson's death was not a triggering event for purposes of HUD's regulations. *See Wabash Valley Power Ass'n, Inc. v. Rural Electrification Admin.*, 903 F.2d 445, 452 (7th Cir. 1990) (finding that the APA authorizes declaratory

judgments for claims that an agency action is contrary to law) (citing *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167 (1967)). *See, e.g., Harris*, No. 1:14-cv-3110, 2015 WL 13547618 at * 8 (N.D. Ga. Nov. 19, 2015) (entering declaratory judgment that § 206.27(c)(1) was invalid as applied to the reverse mortgage at issue, and that the borrower's death was not a triggering event for purposes of HUD's regulations). As HUD has acknowledged, such a ruling would have the "automatic" effect of invalidating the regulatory provision requiring foreclosure. That ruling would have no impact on the contractual relationship between the mortgagee and mortgagor. It would, however, allow RMS to continue collecting interest on the loan, thereby removing the economic incentive to foreclose. *See Plunkett*, 67 F. Supp. 3d at 19. None of these methods of redress would void or alter the terms of either the subject reverse mortgage or FHA insurance contract. Therefore, the Court finds that a favorable decision is likely to address Ms. Wilson's injury.

As a final matter, Ms. *Wilson bears the burden of demonstrating* standing separately for each form of relief sought. *Friends of the Earth*, 528 U.S. at 185; *Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) (notwithstanding the fact that plaintiff had standing to pursue damages, he lacked standing to pursue injunctive relief). Ms. Wilson requests the following forms

of relief that are presently under dispute: (1) an order that HUD must take assignment of the subject mortgage; (2) an order that HUD must otherwise make RMS whole such that RMS is not required to prosecute the underlying foreclosure action; (3) an order that HUD must waive the 120-day rule requirement; and (4) "other just and equitable relief." (Am. Answer at 17, 19.) The Court does not have authority to order HUD to take assignment of the subject reverse mortgage. This relief is expressly prohibited by the National Housing Act, which states, "[n]o provision of this Act, or any other law, shall be construed to require [HUD] to provide an alternative to foreclosure [for lenders with insured mortgages] or to accept assignment of such mortgages." 12 U.S.C. § 1715u(f). The only agency action the Court can compel under the APA is action legally required. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004); 5 U.S.C. § 706(1) (authorizing courts to "compel agency action unlawfully withheld"). Accordingly, Ms. Wilson does not have standing to pursue this type of relief. Ms. Wilson does, however, have standing to proceed on all other forms of relief that do not rely on the Court ordering HUD to take assignment of the subject reverse mortgage. Additionally, there are likely forms of relief that are presently beyond Ms. Wilson's knowledge, because a favorable decision in this case may involve remand to HUD for it

to determine how best to provide relief. *See Lorion*, 470 U.S. at 744.

### *2. Mootness*

A case becomes moot—and therefore no longer a "case" or "controversy" for purposes of Article III—when "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (*per curiam*) (internal quotation marks and citation omitted). A case is not moot as "long as the parties have a concrete interest, however small," in the litigation's outcome. *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016) (citation omitted). Here, HUD argues that Ms. Wilson's regulation challenges are moot for three reasons: (1) HUD has formally amended the challenged regulations, bringing them into compliance with the authorizing statute; (2) ML 2015-15 "effectively amended" the regulations, bringing them into compliance with the statute; and (3) HUD is a government actor that should be granted additional deference under the voluntary cessation doctrine. The Court will discuss each argument in turn.

First, the Court addresses HUD's claim that the regulation challenges are moot because 24 CFR § 206.27(c) was amended by a HUD Final Rule, 82 FR 7094 (Jan. 19, 2017). The Final Rule amended § 206.27(c) to require *new* reverse mortgages to include a provision

deferring the due and payable status for eligible non-borrowing spouses when their borrower spouses die (functionally codifying the provisions of ML 2014-07). *See* 24 CFR § 206.27(c)(3) (effective September 19, 2017). According to HUD, after this amendment, the regulations are no longer inconsistent with the authorizing statute. This argument, however, ignores the fact that the newly amended regulation has no effect on the subject reverse mortgage because it was issued in 2009. Ms. Wilson is alleging that the newly amended regulation, as applied to her, still violates the "anti-displacement" provision of the authorizing statute. Therefore, the HUD regulations still present a "live" controversy for the Court to consider. HUD's argument fails.

HUD's argument that the regulation challenges are mooted by ML 2015-15 fare no better. The Court currently need not resolve the parties' dispute over whether Mortgagee Letters can "amend" federal regulations for purposes of the APA. Even assuming Mortgagee Letters can amend regulations, Ms. Wilson is alleging that 24 CFR § 206.27(c)(1) as "amended" by ML 2015-15 is still in violation of the authorizing statute. She supports this contention with the allegation that the regulation as amended, and the mortgagee letter, still operate to require lenders to foreclose on a surviving spouse in contravention of the statutory requirement. HUD's argument thus misses the mark.

Finally, HUD argues that the regulation challenges are moot because HUD voluntarily ceased the offending conduct. Generally, a case can be mooted by the defendant's voluntary conduct only if subsequent events "made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to occur." *Friends of the Earth*, 528 U.S. at 189 (quoting *Concentrated Phosphate Export Assn.*, 393 U.S. 199, 203 (1968)). The Court uses a more deferential standard when the defendant voluntarily ceasing unlawful conduct is a government entity—the Court will place "greater stock in" a government act of self-correction, so long as it appears genuine. *Fed'n of Advert. Indus. Representatives, Inc. v. City of Chicago,* 326 F.3d 924, 929 (7th Cir. 2003) (citation omitted). The Court need not examine whether HUD met the burden of establishing mootness by voluntary cessation, however, because ultimately that argument is inapplicable in the context of Ms. Wilson's regulation challenges. Ms. Wilson is alleging that HUD has not "ceased" the "conduct" of §§ 206.27(c)(1) and 206.3 as applied to her. This is evident in the fact that the regulations still operate to require RMS to foreclose on Ms. Wilson due to the fact that her husband passed away. Accordingly, this final argument fails, and the Court finds that Ms. Wilson's regulation challenges are not moot.

### 3.  *Jurisdiction under the APA*

HUD's final jurisdictional argument is that Ms. Wilson's regulation challenges are not judicially reviewable. The APA provides a right of action and waiver of sovereign immunity for judicial review of agency actions in suits seeking relief other than money damages. 5 U.S.C. §§ 551, *et seq.* Judicial authority to review federal administrative agencies' conduct is governed by the APA. *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1207 (2015). The APA limits judicial review of administrative action in several ways. The agency action for which Ms. Wilson seeks review must fit within the definition of "final agency action" for which there is no other adequate remedy in court. 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 175 (1997). The agency action may also be shielded from judicial review if it is one "committed to agency discretion by law," or if there is a statute that limits judicial review. 5 U.S.C. § 701(a); *Bennett*, 520 U.S. at 175. For HUD to prevail, it must overcome the "strong presumption" that Congress intends judicial review of administrative action. *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 670 (1986).

HUD argues Ms. Wilson's regulation challenges are not judicially reviewable because § 206.27(c) was "amended" by ML 2015-15 and was formally amended in the Code of Federal Regulations in 2017. Therefore, HUD asserts Ms. Wilson is not

challenging a "final" agency action under the APA. As a general matter, two conditions must be satisfied for agency action to be "final": First, the action must mark the "consummation" of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature. *Bennett*, 520 U.S. at 177–78 (citation omitted). Second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow." *Id*. (quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). However, as will be discussed below, the finality inquiry is misplaced in this context.

First, regarding HUD's argument that ML 2015-15's MOE effectively "amended" § 206.27(c), the Court will note again that it will not now settle the parties' dispute over whether mortgagee letters can amend federal regulations for APA purposes. Regardless, HUD claims that because ML 2015-15 "amended" § 206.27(c), that regulation is no longer a final agency action subject to APA challenge. In support of this argument, HUD points to the fact that the District Court of D.C. found a prior version of the MOE to be a "reasonable" program, not arbitrary or capricious. *Plunkett*, 67 F. Supp. 3d at 16. That decision, however, is not binding on this court; nor is it persuasive. The opinion does not support the contention that § 206.27(c) is unreviewable

under the APA because it has been "amended" by the ML 2015-15 MOE. Judicial reviewability of § 206.27(c) was not at issue in *Plunkett*. Rather, *Plunkett* held that an earlier version of the MOE (extended only to the *Bennett-Plunkett* named plaintiffs) *was* judicially reviewable under the APA. *Id*. at 13 (holding that the MOE was judicially reviewable and subjecting the MOE to arbitrary and capricious review). Moreover, the opinion addresses a version of the MOE that did not include a 120-day election deadline, which differs from the MOE Ms. Wilson is currently challenging. Thus, this argument fails.

Next, HUD asserts that because § 206.27(c) was formally amended in 2017, the prior version of the regulation is unreviewable. Both of HUD's finality arguments seem to assume that Ms. Wilson is challenging only the *prior* version of § 206.27(c). But Ms. Wilson argues that even after its 2017 amendment, § 206.27(c) as applied to the subject reverse mortgage still violates the authorizing statute. Thus, the finality inquiry is inappropriate in this context, and these arguments fail. The Court finds that judicial review under § 706(A) and § 706(C) of the APA is proper for Ms. Wilson's regulation claims.

### B. Dismissal under Rule 12(b)(6)

Having established that this Court has jurisdiction to hear Ms. Wilson's APA challenges, the Court turns next to whether Ms.

Wilson has stated a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). A claim has facial plausibility when the plaintiff pleads "sufficient factual content that allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct." *Iqbal*, 556 U.S. at 678. Allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion. *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (citation omitted).

Ms. Wilson raises four separate APA claims. The first two are that HUD regulations 24 C.F.R. § 206.27(c)(1) and § 206.3 (1) are arbitrary, capricious, or otherwise not in accordance with the law under 5 U.S.C. § 706(2)(A); and (2) exceed HUD's statutory authority under 5 U.S.C. § 706(2)(C). The second two are that the 120-day MOE deadline (1) is arbitrary, capricious, or otherwise not in accordance with the law under § 706(2)(A); and (2) exceeds HUD's statutory authority under § 706(2)(C). To state a claim under § 706(2)(A), a plaintiff must allege that the agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Court will

uphold the agency action if the agency has considered the relevant data and articulated a rational connection between the facts found and the choice made. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). To state a claim under § 706(2)(C), a plaintiff must allege that the agency action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). A court must assess a § 706(2)(C) challenge using the two-part test laid out in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837 (1984). If the intent of Congress is clear, the Court must give effect to that intent. *Id*. at 842-43. If the Court determines Congress has not directly addressed the precise question at issue, the Court must assess whether the agency's answer is based on "a permissible construction of the statute." *Id*. at 843.

HUD fails to raise any arguments for why Ms. Wilson has insufficiently pled the elements of her claims. Instead, HUD only offers a single sentence in support of 12(b)(6) dismissal, stating that Ms. Wilson "pleads no facts to plausibly support an allegation that HUD is the cause of her injury, that she is entitled to relief from HUD, or that HUD has the authority to redress her injury." (Def.'s Mot. at 11). These arguments are duplicative of HUD's Rule 12(b)(1) arguments, which have already been discussed and

rejected above, pursuant to the same "plausibility" pleading requirement. *Silha*, 807 F.3d at 174. The burden is on the moving party to prove that no legally cognizable claim for relief exists. *In re Rough Rice Commodity Litig.*, No. 11 C 618, 2013 WL 214164, at *3 (N.D. Ill. Jan. 16, 2013) (citation omitted). HUD fails to meet that burden. Therefore, it suffices to say simply that the Court denies HUD's Motion to Dismiss for failure to state a claim.

### III.  <u>CONCLUSION</u>

For the reasons stated herein, Defendant's Motion to Dismiss (Dkt. No. 15) is granted in part and denied in part. Defendant's Motion is granted insofar as Ms. Wilson lacks standing to proceed on her request that the Court order HUD to take assignment of the subject reverse mortgage. Defendant's Motion is otherwise denied.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: 2/5/2019